Okay, and we'll finish off the morning with case number 21-13567, SIS, LLC v. Stoneridge Software. Whenever you're ready, Ms. Davis. Thank you, Your Honor. May it please the Court, my name is Amy Davis and I represent the plaintiff appellant, SIS, LLC, and this appeal concerns the enforceability of a liquid data damages clause that was entered into between two experienced veteran Microsoft software consulting companies as part of a mutual confidentiality agreement. At trial, the jury determined that Stoneridge violated that confidentiality agreement by using SIS's information to directly solicit SIS's client and ultimately take over what was the largest implementation project in the Microsoft Dynamics world at that time. The district court found that the liquidated damages clause was unenforceable under Georgia law and pursuant to Federal Rule of Civil Procedure 50, and that ruling should be overturned for many reasons, but I'll concentrate on three here today. First, it was woefully premature and violates Rule 50 for that reason. Second, it did not hold Stoneridge to its burden of proof. And then finally, the ruling is contrary to the only evidence that came in at reasonableness of the party's pre-estimate of probable damages. And just to remind me at least, because I can't believe I didn't write it down in my notes, what was the sum of the liquidated damages provision? So it wasn't a sum certain, it was actually a formula or a benchmark, and what it said is, and this was a mutual confidentiality agreement, would have applied to either party who had breached, but it says the benefit directly or indirectly of the breaching party would be the liquidated sum. And what was the formula in essence? Just whatever the indirect or direct benefit of the breaching party as a result of using the confidential information. Basically disgorgement. Well, it is, yes, but I would say that it's the same formula that you use in disgorgement, but it is not disgorgement here. What it is, is a pre-estimate on the part of the parties that says, look, lost profits in these matters are very difficult to prove. In fact, lost profits require, it would require SIS to prove what would have happened but didn't happen. And given the economics of this particular industry, which means that in this industry, all of the Microsoft partners share profit margins, the same or similar profit margins on these deals. And as a result of that, it's a much more reasonable thing to do to use the breaching party's benefit as a benchmark. What do you think that benefit was? Well, the benefit was the whole contract? Yes. Yes, Your Honor. And that's disgorgement. Because as I understand the briefs, and again, I haven't gone back to look at the trial evidence, the vendor had made a decision to sort of disassociate from SIS and then contacted Stone Ridge, right? And it was after that contact that the breach of the confidentiality agreement took place. Am I right about that? Well, no, Your Honor. I believe that the evidence was a little bit different. Okay. First, the evidence showed that Stone Ridge solicited the API group. There was evidence that the API group was frustrated with SIS. But guess what? There was evidence, too, that that's very common in these implementations. They're very difficult, they're very time consuming, they cost a lot of money, and it slows down the operation of business in the meantime. The evidence also showed that the very same frustrations that API had with SIS, it had with Stone Ridge after they took over the project. And then finally, there was also evidence that there was one person at API group from which the frustration emanated, and that happened to be the very person that Stone Ridge, their main contact with API. So at the very same time that Stone Ridge is starting to solicit this API contact, he suddenly becomes disenchanted or frustrated with SIS. But there was no evidence that SIS was terminated for cause. In fact, the evidence was that they continued to work on the project, the rest of the project, but in a much diminished role, in a much diminished role. The role that mattered was as implementation partner. And your allegation, and I presume proof at trial, was that Stone Ridge's initial contact with API already constituted a breach? Or was it the use of the SIS information in the API contract that caused the breach? It was the use of the information that caused the breach, Your Honor. So then how could you claim that the entire amount of money derived from the contract would have set out the liquidated damages provision? Well, it's our position that they would never have gotten the contract. They would never have been successful in taking over the implementation project without that confidential information. The evidence showed that... That's disgorgement, right? Which is disfavored under Georgia law. Well, Your Honor, I don't believe it's disgorgement. It is the same formula, but here what we have... What would you call it? I would call it two competent parties... No, no, no. What would you call, in substance, what would you call what Stone Ridge has to pay you? The liquidated sum. The formula... Which in sum is what? Lost profits. The lost profits as estimated by using the benefit that the breaching party gained as a benchmark. What are the benefits? Is it net costs? Net profits? It's net profit. Yes. Says what? The contract says net profit, or that's your interpretation of what benefit means? The contract says benefit, and I think that's a fair reading. Benefit would be what they gained. They gained the revenue minus expenses, or another way of saying net profit. Your Honor, I think it's important, too, to think about the prematurity of the ruling. By the way... I'm sorry, before you get to that, I'm sorry. It was off. It was off. I just turned it on. Before you get to that, my question for you is why is disgorgement, or whatever else you may want to call it, a reasonable pre-estimate of the probable loss? So the only evidence that came in at trial as to the reasonableness of the estimate came from SIS's expert, who is a 35-year veteran in this industry, and he testified that because of the economics of the industry, that any partner of comparable size would have made roughly the same amount using this information or on this particular project. What was the amount? The amount is about $5.6 million in net profit. They made almost $15 million in revenue. But going back to Your Honor's question, this is a very unique industry in that these consultants are selling two things. They're selling Microsoft software, and they are also consulting services to implement that software. Microsoft has the same agreement with all of its partners. If you sell its software, I think it's 20%. You get a 20% commission. It's true for all of them. So we know that benefit is going to be the same as the lost profits of the non-breaching party. Now when we turn to the sale of consulting services, the same is true. The things that go into making up the net profit on consulting, revenue and expense. So when we look at revenue, revenue is a function of rate for the consultant's hours or their time, and then the number of hours. Well, the testimony was that the rate for these projects is going to be, may vary a little, but it's going to be within a very tight range because these consultants or companies are competing nationwide for the very same customers. The hours that they are going to spend on a particular project are also going to be the same because the work that needs to be done is the work that needs to be done. Can I ask you one more question? I see you're getting to the end of your time and I just would like you to address why isn't this a penalty? I mean, essentially, it strips from Stone Ridge all of the money that it would have made. Why isn't that a penalty? That's not a penalty. So I think it's important for us to look at what was the loss these parties were estimating at the time they entered into that mutual confidentiality agreement. And the confidentiality agreement was entered into for the express purpose of negotiating an arrangement by which Stone Ridge would be providing subcontract services for SIS on the API group project. Now, why is that important? Because it tells us what kind of Stone Ridge was going to provide information about its experience and its skill set, and SIS was going to share information about the API group business, their software needs, what they wanted that software to do, what they needed it to do, and then SIS's strategy for getting that software to do those wants and those needs. So what was the most likely misuse of that confidential information? The most likely misuse was the unfair competition in taking over a customer. And in this case, because there was so much information that would be API specific, the most likely misuse would be unfairly competing for the API group project. So here's the choice that the parties made. The loss of a breaching or the loss of the non-breaching party would be their lost profits from the unfair competition. Now, this court has time and again, and other Georgia courts have time and again said, it's very, very difficult to prove lost profits. You're proving what didn't happen. That's hard to do. And in Georgia, the statute and the Georgia Supreme Court have said over and over again, competent parties are allowed to determine, to find a benchmark for those kinds of difficult to ascertain damages. Here, they decided that the benefit of the breaching party for using that information is going to be roughly the same. And it's not going to require us to prove a negative. We're going to be able to show exactly what that was. And that's why using that as a benchmark was reasonable and not a penalty. So if the breaching party derived no financial benefit, liquidated damages would be zero. That's right. That's right. And this was a to have lived with that. Whatever the benefit it was, that was going to be the liquidated sum, no matter who breached the agreement. Ms. Davis, thank you very much. Thank you. You saved your time for rebuttal. Thank you. How do we pronounce your last name? May it please the court, Barton Gernander. Gernander, okay. Your Honor, in this case, SIS really is confusing whether its damages were difficult or impossible to ascertain at the time of entering into the MCA versus difficulty of making such an estimate. This clause operated as a penalty. It was focused solely on benefit derived by the breaching party, which in this case was Stone Ridge. It does not focus on the actual loss suffered by SIS. But what would be the way to calculate the actual loss suffered by SIS? Well, in this case, they had to present a claim for actual loss and then develop the evidence, neither of which they did. They didn't because they were going to rely on a liquidated damages clause until they got knocked out. Well, except, Your Honor, that only occurred a month before trial. Up to that point, they had been pressing claims based upon both this MCA, the Mutual Confidentiality Agreement, and also upon a subcontract that was never executed. A month before trial, they dropped all claims relating to that subcontract and elected to proceed solely on this MCA and filed a third amended complaint approximately three weeks before trial. If this liquidated damages provision had set a million dollars, would it be upheld under Georgia law? Possibly, if it were shown to be a reasonable pre-estimate. I mean, typically parties are just making it up as they go. I mean, they don't know what the damages are going to be. They don't know what the breach is going to be. They don't know what the causal effect is going to be. Everybody is projecting into the future and trying to figure out what's commercially viable, what's going to work here, what's a middle road for us to meet in case there's a breach by one side or the other. There are always estimates. Absolutely, Your Honor. I absolutely agree. There are always estimates, but there has to be some attempt to figure out what that number is, which is why typically you either see a set lump sum number or a formula where they would say, for example, it's going to be 20 percent of the contract price that SIS had with API Group, the end customer. Here, there's none of that. It focuses solely on Stone Ridge. But if it's at 20 percent of the contract price, then, I mean, it sounds like that would be the exact same thing as the net benefit. Except, Your Honor, I think it's important to focus on it would be 20 percent of SIS's contract. And here, Stone Ridge's contract was not co-equal. It was, in fact, larger. We did more work for API than SIS. SIS is not arguing that they should limit the liquid data damages just to that portion that's equal. They want all of the money. And they use a number, 5.6 million, a number which was derived by their expert, Mr. Bowman, who did not examine any of Stone Ridge's actual net profits. I want to address that. There was a trial ruling on that issue. And it is not the result of any misconduct or failure to produce by Stone Ridge. Mr. Bowman didn't look at any actual numbers for Stone Ridge. He came up with numbers that he estimated. And one of the critical things that he did not take into account, which, as my co-counsel pointed out, there is a commission paid by Microsoft to whoever the implementation partner is. And counsel argued that that's a very important role, that they lost that role because of improper competition by Stone Ridge. The problem is that when Stone Ridge took over this job from API, or from SIS for API, there was a negotiated deal where SIS continued to be paid the implementation partner money from Microsoft for two years. That's not money that ever went to Stone Ridge. It went to SIS. Mr. Bowman didn't use that in any of his computations. His numbers were rejected by the jury because they were just simply unreliable and unfounded. The true number for Stone Ridge's profits after several years of working at API was about 1 million. But that's, again, not what SIS is asking for. They're asking for a much higher number, which is based on speculation. But again, this all focuses on Stone Ridge. And to be enforceable... I'm sorry. I just want to make sure I understand. You said Stone Ridge's profits were about a million dollars. Their net profits, yes, Judge Rosenbaum. Okay. So if SIS is asking for the benefit, why wouldn't it be a million dollars then? Well, again, because it's unenforceable as a penalty against Stone Ridge. I understand that. I'm not asking that. But you said they're asking for more money than that. I'm just trying to figure out. I'm trying to sort out where that's coming from. In other words, if they're asking for the net benefit, regardless of whether or not that's a penalty and whether it's a reasonable pre-estimate, if they're asking for, I think you said, $5.6 million and you say that the net benefit to Stone Ridge was $1 million, what accounts for that difference between the $5.6 million and the $1 million? To be blunt, a poor job done by their expert. He inflated the number because they weren't happy with a million dollars. That was the only evidence submitted into the record of the actual net benefit to Stone Ridge. And SIS did not like that number. Frankly, up to about a month before trial, they had been asking for many multiples higher than that. Their alleged damages at one point were about $50 million. In this case, just so the panel is clear, all came down to two emails. There were emails that were sent by SIS to Stone Ridge early on in the process when they were talking about Stone Ridge working as a subcontractor for SIS on the API project. The violation was that later when API approached Stone Ridge about taking over the project, an internal employee of Stone Ridge recirculated internally those two emails. There was never any evidence that Stone Ridge actually used those to pitch API, whether they derived any benefit from it. But it was enough for the jury to find a violation and to award nominal damages only, which leads into our appeal. And if the panel doesn't have further questions about this issue, I'd like to switch to our appellate issue. Are you saying that any, before you move on to your appeal, are you saying that any liquidated damages provision that is tied to profits is unenforceable under Georgia law? No. I'm saying this one is. So if it would have said lost profits, it's enforceable? I think if it had said a percentage of the expected lost profits of SIS with evidence from SIS presented at trial that showed their track record. And we briefed this issue, Your Honor. There is case law that talks about how you prove up such expected damages, such expected actual damages. And essentially it looks at having a track record showing what your actual, for instance, labor costs are. In this case, SIS made the strategic decision not to introduce any of that, even after they changed their theory a month before trial. SIS had a bad liquidated damages clause. And made strategic trial decisions that led them to this situation. It is not our argument, nor is it the law, that there is not a liquidated damages that could be, liquidated damages clause that could be enforceable in Georgia. We, in fact, argue that it is entirely possible to have an enforceable liquidated damages clause and potentially one that looks at the lost profits of SIS. But that's not what this clause says. And it is not what SIS chose to pursue at trial. All right, let's talk about your, your appeal. Very simply, Your Honor, the jury erred. The jury was given a reasonable definition of what nominal mutual confidentiality agreement, that they were only entitled to award nominal damages. However, the jury clearly expressed that they did not understand what their role was or what the instructions they had been given were. They asked a specific question to which the court simply said that the proper amount was up to the jury to decide. Stoneridge asked that the jury be read the language of the Georgia statute. That was not given. It's our position that had that been given, the jury wasn't. Wasn't that given in form, in some form, during the regular jury instructions? It was not, Your Honor. What was the jury told about nominal damages in the regular jury instructions? Nominal damages are generally defined as a trivial sum awarded where a breach of duty or an infraction of that plaintiff's right is shown. That is not the same language as Georgia statute 13.6, sorry, 13-6-6, Your Honor. How does it differ in substance? In substance, it's the focus on the triviality. I think that that uses the term trivial, right? It does, Your Honor, but I think it's a question of emphasis. When the jury expresses that they don't understand or that they have further questions, it's incumbent on the trial court to give them that further instruction. We think that reading the Georgia statute would have provided them with the additional information they needed to come up with a proper nominal damages award. Is that the only argument that you have for why this was not an appropriate amount of damages? Well, it is not, Your Honor. It is, as a matter of law, too great. Why is that? Because, you know, the Georgia courts have approved a nominal damages award of $625,000 for abuse of litigation and some other high awards as well, and they've said specifically, instead of being restricted to a very small amount, the sum awarded is nominal damages may, according to circumstances, vary almost indefinitely. That's true, Your Honor, except I would take exception and say that the courts have not approved a $625,000 award of nominal damages. In fact, that award was reversed on grounds relating to the amount of the damages, and it was not sustained at the district court level. Instead, there was a private settlement. So, in fact, I'd say that that holding does not have any sort of precedential value. But on appeal, the Georgia Court of Appeals upheld that award of nominal damage, did it not? It said that it was not excessive as a matter of law, right? On that narrow point, it did not remand on that issue, Your Honor. It remanded the award for other reasons, and so I would argue that that strips of any precedential value. And it also is an outlier for the reason that— So you have another one with $22,000. And another for $53,000. But $85,000 would be the highest number other than that outlier of $625,000. And as I— So what number do we put on trivial nominal damages under Georgia law? We put a number on it? You can. It's anywhere from $1 to $100. What number would you like? $400. How much? $400. And what do we do with the verdicts of $22,000 and $53,000 that have been upheld? As we argue in our brief, Your Honor, there is truly a de facto distinction of nominal damages awards in Georgia. Because nominal damages can be granted for two reasons. One, where there is no claim of actual damages, but it's a vindication of rights. The other is where a party has claimed actual damages and has presented some evidence, but it has not met its burden of persuasion and otherwise proven up the actual damages amount. In those cases where there was an award of $625,000 or $22,000 or $53,000, all of those cases involved situations where a plaintiff alleged actual damages, presented evidence of those actual damages, and for whatever reason did not convince the trier of fact that those actual damages should be granted. Every other case— They didn't present any evidence at all of damage at trial? None. None. They, in fact, specifically waived any claim of actual damages. In their pretrial briefings, they made no claim for actual damages and presented no evidence. Their argument was effectively that—I mean, before the court—was effectively that the liquidated damages provision represented a reasonable estimate of what their damages were. Now, whether you agree with it or not, they presented evidence as to what they claimed the benefits to your client were, which they then said was a reasonable estimate of the damages they would have incurred. Why isn't that sufficient? Well, they were conflating their damages calculations between the Georgia Trade Secrets Act claim, where they could present evidence of the claimed benefit to our client, versus the breach of contract claim, where they only could seek nominal damages. So, they cannot use this— Which meant they didn't prove up their damages? Well, they couldn't even present evidence of actual damages because they could not be entitled to them. So, looking narrowly at the breach of the MCA, a breach of a contract claim, they presented no evidence on that claim. They can't say, well, we got some evidence in on a claim, so we're entitled to use that here, when it's barred by law. They could not seek those damages here. So, they presented no claim and no evidence. So, therefore, they're lumped into that broad category that we've surveyed, where courts have routinely said even awards as high as $5,000 are too great. And I see my time is up, so I'll wrap up very quickly. The $400 number is not the action, which is quoting language from the Georgia statute. It's the filing fee, which is in the public record. So, that's why we're seeking remand for $400. And we've argued this court can remand with that direction, or alternatively, we remand to the district court for determination by the district court. We do not believe that a new trial is required on any of the two appellate issues. Unless the court has further questions, I'll sit down. Thank you very much. Thank you. Your Honors, I believe that there may have been some confusion about the timing of the court's ruling. The timing of the ruling was on the third day of an approximately two-week trial. Rule 50 doesn't give a specific time about when a court can make a judgment as a matter of law, but it does say that parties must be fully heard. And the advisory committee notes make clear... But counsel, I mean, wasn't your client given the opportunity to present a brief and advise the court that it would much prefer not to present a brief, that it was too much, and they'd like to be heard in oral argument. And then didn't the court have oral argument the following day? Why is that not sufficient? Because under Georgia law, there is a fact-finding element. In the Fuqua case, and I can get the site, the court specifically says that although it is ultimately a matter of law for the court to decide about the enforceability, there is necessarily some fact finding about the reasonableness of that pre-estimate. And Georgia law is very clear that it is Stonebridge that bore the burden to prove that it is a penalty. SIS didn't have to prove anything. We did prove that it was reasonable, but it was Stonebridge that bore the burden of proving it was a penalty. This ruling that came out barely halfway through the plaintiff's case and before the defendant had put on any evidence is an absolute violation of Rule 50. Again, there are necessarily findings of fact for the trial court to make before making the final decision as a matter of law as to enforceability. The district court couldn't have done this at summary judgment? Yes, it could, but it requires evidence. It requires evidence. And in fact, there are several cases where the Georgia courts have said either we find that the defendant has not proven the penalty, that this is a penalty, and so we are going to enforce the liquidated damages clause at the summary judgment stage. There is also a case where they say we're not going to rule or we're not going to grant summary judgment on the issue because there's an issue of fact that needs to be determined later at trial. Did you complain at the time of the argument that there wasn't an opportunity for evidence to be presented? Yes, Your Honor, I did. I asked the trial court, I made the, you know, I presented the cases that said it was their burden that there was a fact-finding element, and I asked the court to rule or to defer ruling until after both parties have been fully heard. That's cited in the brief. So yes, there is a record. The record will reflect that. Very quickly, I will address the issue of nominal damages, only to say this, that the Georgia law does, in fact, require that the trial court promptly and sufficiently address any jury question, but it specifically says the extent and character of additional instructions is within the sound discretion of the trial court, where the district court's supplemental instruction during deliberation answers the jury's question, does not mislead the jury, and correctly reflects the law. It falls squarely within the trial court's range of the circuit in 2016. Here, Stonebridge did not object to the definition the court gave of nominal damages, and it concedes in its brief here that the court correctly stated the law in making that supplemental instruction. There's simply no basis for the court to set aside the nominal damages award, and I'll leave the court simply with this. We believe that obviously the judgment on liquidated damages should be reversed. The record here shows that the defendant did not meet its burden of proof. In fact, they put on absolutely no evidence that the liquidated damages sum, our formula, our benchmark, however you want to put it, was a penalty, and Georgia courts over and over again say, in the absence of burden of proof, the liquidated damages clause must be enforced, and that's all in our briefing. So we ask that the court reverse that judgment, find that the liquidated damages clause is enforceable, and then remand solely for the purpose of determining the amount of that benefit. And as you heard, there is a dispute about what that benefit was, and it's beside the point, I think, for purposes of the appeal. I'll simply say only that Stonebridge did not, it said until I believe just a few weeks before trial, that it could not give a profit per project, and so it didn't offer a number until right before trial, and our expert had no choice but to then use generally accepted methods to come up with their profit. All right, Ms. Davis, thank you very much. Thank you. Mr. Gernander, thank you very much as well. We're in recess for today.